UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ULISES E. CONTRERAS,
   also known as Ulises E. Contreras Ortiz,

Defendant.

CRIMINAL CASE NO. 25-181-1-BAH

**FILED**

APR 17 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### STATEMENT OF OFFENSE

The United States of America, by its attorney, the United States Attorney for the District of Columbia respectfully submits the following Statement of Offense in the above-captioned case.

The following proffer of the government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This proffer is not intended to be a disclosure of all the evidence available to the United States nor, to the extent it makes representations concerning anything the defendant said, is it a recitation of all that the defendant said.

The parties stipulate to the following facts.

### BACKGROUND

1.     ULISES E. CONTRERAS, also known as Ulises E. Contreras Ortiz, resided in the District of Columbia and Maryland.

2.     KARIN L. CONTRERAS, also known as Karin L. Contreras Ortiz, resided in the District of Columbia.

3.     ULISES CONTRERAS and KARIN CONTRERAS are siblings.

4.     ESDRA N. CASTILLO, also known as Esdra N. Castillo Felipe, resided in Maryland. ESDRA CASTILLO is KARIN CONTRERAS' estranged spouse.

5.      MANUEL DE LA CRUZ CONTRERAS, also known as Manuel Domingo De La Cruz Contreras, resided in Maryland, and is the cousin of ULISES CONTRERAS and KARIN CONTRERAS.

6.      Individual Two, who is currently incarcerated in New York for unrelated crimes, resided in Washington, D.C. Individual Two was in a romantic relationship with KARIN CONTRERAS.

7.      At various times, ULISES CONTRERAS, MANUEL DE LA CRUZ CONTRERAS, and Individual Two lived at or stayed at KARIN CONTRERAS' residence.

8.      On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT") was signed into law. The CARES Act created the Pandemic Unemployment Assistance ("PUA") program, which provided unemployment benefits to individuals not eligible for regular unemployment compensation or extended unemployment benefits.

9.      The CARES Act also provided for an emergency increase in unemployment compensation benefits, referred to as Federal Pandemic Unemployment Compensation ("FPUC"). The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

10.     The PUA and FPUC programs ended in September 2021.

11.     The PUA, FPUC, and LWA programs were administered by various State Workforce Agencies, but those programs' benefits were funded by the federal government, with program administration and oversight by the U.S. Department of Labor and/or the U.S. Department of Homeland Security. The State of Maryland managed its unemployment insurance ("UI") compensation program through the Maryland Department of Labor ("MD DOL").

12. An individual applying for Maryland UI benefits online had to submit several categories of personal identifying information ("PII"). Claimants also certified that they had their hours reduced by their employer or had been separated from employment altogether, including during operation of the PUA program, due to business closures or other reasons related to COVID-19.

13. Applicants could choose whether to have the MD DOL deposit their unemployment benefits directly into a linked bank account specified by the claimant or loaded onto a prepaid debit card provided by Bank of America, which was shipped to the applicant via the United States Postal Service to the physical address listed on the application. Prepaid cards were automatically reloaded with newly dispersed funds via electric transfers using the internet.

14. Bank of America operated Automatic Teller Machines ("ATMs") nationwide, including in the District of Columbia.

## THE WIRE FRAUD SCHEME

15. Beginning no later than June 2020, and continuing through in or about March 2021, ULISES CONTRERAS conspired with KARIN CONTRERAS, ESDRA CASTILLO, MANUEL DE LA CRUZ CONTRERAS, Individual Two, and others to defraud COVID-19 era unemployment programs administered by the state of Maryland by fraudulently obtaining UI benefits and withdrawing cash from ATM machines using pre-paid ATM cards.

### Fraudulent Submission of Unemployment Applications

16. At the start of the COVID-19 pandemic, ULISES CONTRERAS, KARIN CONTRERAS, MANUEL DE LA CRUZ CONTRERAS, and Individual Two applied for UI for themselves and obtained pre-paid debit cards loaded with benefits.

17.    ULISES CONTRERAS, KARIN CONTRERAS, MANUEL DE LA CRUZ CONTRERAS, ESDRA CASTILLO, Individual Two, and others then conspired to obtain UI benefits in other people's names.

18.    Specifically, as part of the conspiracy, ULISES CONTRERAS submitted more than 100 applications for UI benefits using stolen identities and identities of people who conspirators were aware did not qualify for UI benefits. ULISES CONTRERAS entered the fraudulent information in the online portal, using common email, phone number, and address identifiers so he could control all the applications.

19.    ULISES CONTRERAS submitted these applications in other people's names using PII that he personally obtained, that KARIN CONTRERAS provided him, that MANUEL DE LA CRUZ CONTRERAS provided him, that Individual Two provided him, and that other conspirators provided him.  A significant number of the identities were obtained from the Dominican Republic and related to individuals who had been deported from the United States.

20.    ULISES CONTRERAS charged other conspirators a cut of each successful fraudulent UI benefit application he submitted on behalf of others except for applications he submitted on behalf of his sister KARIN CONTRERAS.

21.    ULISES CONTRERAS kept ledgers of stolen identities on his personal iPad.

### Receipt of Pre-Paid Debit Cards

22.    Based on the fraudulent applications, conspirators received pre-paid ATM cards loaded with benefits totaling over $1 million. The overwhelming majority of these cards were

mailed to the address immediately next to where KARIN CONTRERAS resided with ULISES Contreras and Individual Two.

## Use of Debit Cards at ATMs

23.    ULISES CONTRERAS, KARIN CONTRERAS, MANUEL DE LA CRUZ CONTRERAS, ESDRA CASTILLO, Individual Two, and other conspirators all withdrew funds from the pre-paid debit cards at ATMs, typically in increments of $1,000, the maximum daily withdrawal limit on the cards.

24.    ULISES E. CONTRERAS was captured on Bank of America ATM surveillance, using fraudulently obtained pre-paid debit cards to withdraw money on multiple occasions, including at ATMs in Washington, D.C., on:

    a.    July 14, 2020, for $1,000, using a card issued in the name of V.T., a stolen identity;

    b.    July 14, 2020, for $1,000, using a card issued in the name of D.S., a stolen identity;

    c.    July 15, 2020, for $500, using a card issued in the name of P.S., a stolen identity;

    d.    July 15, 2020, for $500, using a card issued in the name of D.S., a stolen identity.

25.    V.T., D.S., and P.S. did not know their identities were being used to apply for Maryland UI benefits or that debit cards were being issued in their names.

26.    Each Bank of America ATM withdrawal in Washington, D.C., caused a wire transmission from Washington, D.C. to Bank of America servers located outside Washington, D.C.

27.    In total, conspirators were able to realize approximately $551,000 of the over $1 million loaded onto the cards.

**Airbag Scheme**

28.     ULISES CONTRERAS was heavily involved in the theft and sale of stolen motor vehicle parts, specifically rims and airbags. KARIN CONTRERAS knew that ULISES CONTRERAS stole airbags. She had multiple customers/clients that bought airbags from her, which ULISES CONTRERAS had stolen. ULISES CONTRERAS brought the stolen airbags to KARIN CONTRERAS's residence.

**Post-Arrest Behavior**

29.     On or about September 12, 2025, after ULISES CONTERAS was released from the D.C. jail, his then-fiancée drove ULISES CONTRERAS to KARIN CONTRERAS' residence—where he had been living—to pick up his personal effects. While there, KARIN CONTRERAS, ULISES CONTRERAS, and at least one additional individual, came up with a plan to blame the entire scheme on their paternal cousin, i.e., MANUEL DE LA CRUZ CONTRERAS. During that meeting, KARIN CONTRERAS submerged the GPS monitor affixed to her ankle in a bucket of water, apparently believing that such action would keep the Pretrial Services Agency responsible for monitoring her from being able to listen to the conversation.

**Proceeds**

30.     ULISES CONTRERAS personally kept at least $50,000 from the scheme. All proceeds realized by him from the scheme have been dissipated and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

Respectfully submitted.

JEANINE F. PIRRO
UNITED STATES ATTORNEY

By: _____

Kondi J. Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
(202) 252-6887 | kondi.kleinman2@usdoj.gov

John Kosmidis, NY Bar. No. 4533840
Trial Attorney
Criminal Division, Fraud Section
1400 New York Ave., N.W. | Washington, D.C. 20005
john.kosmidis@usdoj.gov | (202) 641-3109

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding these offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I read every word of this Statement of Offense. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 3/27/26

ULISES E. CONTRERAS
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 3/27/26

EUGENE OHM, Esq.
Counsel for Defendant ULISES E. CONTRERAS

Page 8 of 8