**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KARIN L. CONTRERAS,**<br><br>**Defendant.** | **Crim. Case No. 25-181-2-BAH** |

# UNITED STATES' MEMORANDUM IN AID OF SENTENCING

In March 2020, as the COVID-19 pandemic was ravaging the world, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which was designed to blunt the economic and public health fallout of the pandemic. The CARES Act expanded unemployment insurance ("UI") benefits by, among other things, creating the Pandemic Unemployment Assistance program. That program provided UI benefits to people who were usually ineligible for UI assistance but who could not work for pandemic-related reasons. The additional UI benefits offered through the CARES Act helped many deserving people weather the economic storm caused by the pandemic. Unfortunately, others like Karin Contreras and her co-conspirators chose to criminally exploit the system for personal gain. As a result of her criminal conduct and to reflect the factors set forth at 18 U.S.C. § 3553(a), the Court should sentence her to 41 months' imprisonment.

## I. Background

### A. Upbringing and Work History

Ms. Contreras was born in the Dominican Republic in 1981. PSR ¶ 57. She grew up in challenging circumstances and ultimately immigrated to the United States when she was a teenager. *See* PSR ¶ 59-62, 65, 70-71, 78. She is a lawful permanent resident, but not a U.S. citizen. PSR ¶ 65.

Ms. Contreras told the PSR writer that she has provided in-home childcare since 2008 and reported random jobs over the years. *See* PSR ¶ 83. To her credit, she recently began working at a fast casual restaurant while she awaits sentencing. PSR ¶ 82.

**B. Participation in the Conspiracy to Fraudulently Obtain UI Benefits**

Starting no later than June 2020, Ms. Contreras conspired with others, including her brother Ulises Contreras, to defraud the COVID-19 era unemployment programs administered by the state of Maryland. Her brother was the leader of the operation, but she played an active role. PSR ¶ 20.

At the start of the pandemic, Ms. Contreras applied for UI for herself and obtained a pre-paid debit card loaded with benefits. PSR ¶ 21. She then started conspiring with others, including Ulises Contreras and Manuel de la Cruz Contreras, to obtain UI benefits in other people's names. Ulises Contreras submitted more than 100 applications for UI benefits online using stolen identities and identifies of people who conspirators were aware did not qualify for benefits. PSR ¶ 22, 29. He submitted the applications in other people's names using PII that he personally obtained, that Karin Contreras provided him, that Manuel de la Cruz Contreras provided him, that Individual Two provided him, and that other conspirators provided him. PSR ¶ 22.

As a result of the fraudulent applications, conspirators received pre-paid ATM cards loaded with benefits totaling more than $1 million. The majority of cards were mailed to the address immediately next to where Karin Contreras resided with Ulises Contreras and Individual Two. PSR ¶ 23. After the cards were received, conspirators realized funds from the cards, often by withdrawing money at ATMs in increments of $1,000, the maximum daily withdrawal limit on the cards. PSR ¶ 24. In total, conspirators realized approximately $551,000 of the over $1 million loaded onto the cards. PSR ¶ 25.

Between July 1, 2020, and July 14, 2020, Bank of America surveillance captured Karin Contreras using 12 fraudulently-obtained prepaid debit cards in other people's names to withdraw $23,000 in cash from ATMs in Washington, D.C. This included using an ATM card in the name of C.Y. to withdraw $1,000 on July 7, 2020, and then again on July 14, 2020. C.Y. did not know C.Y.'s identity had been used to apply for UI benefits or that a debit card had been issued in C.Y.'s name. PSR ¶ 28.

On July 1, 2020, Ms. Contreras used two different cards within two minutes, one in the name of R.L.O., the other in the name of J.P.B., to withdraw a total of $2,000 as shown below.





On July 2, 2020, she used a card in the name of C.A.B.G. to withdraw $1,000.



On July 7, 2020, she used cards in the names of J.W. and C.Y. to withdraw $2,000.





On July 8, 2020, she used cards in the names of C.A.B.G. (her second use of this card), A.F.D.P., D.F.R., and J.M.D., to withdraw $4,000 within six minutes.






On July 9, 2020, she used a card in the name of M.A.R.B. to withdraw $1,000.



On July 10, 2020, she used cards in the names of E.A.P.E. and M.A.R.B. (for the second time) to withdraw $2,000 in two minutes.




The next day, she withdrew $3,000 in three minutes using cards in the names of E.A.P.E. J.M.D., and A.F.D.P. This was the second time she used each of these cards.





Then three days later, on July 14, 2020, she withdrew $8,000 using eight different cards in the names of A.F.D.P. (third time used), R.L.O. (second time), L.J.C.C., J.M.D. (third time), R.C., C.Y. (second time), J.W. (second time), and D.F.R. (second time). Co-defendant Esdra Castillo, Ms. Castillo's estranged husband, used the L.J.C.C. card on July 10 and 11. Individual Two, with whom Ms. Contreras was in a romantic relationship, used the L.J.C.C. card on July 15, 2020.



Notably, in addition to providing other people's PII to her brother and personally withdrawing funds, Ms. Contreras also accompanied others while they withdrew funds. On June 30, 2020, while an uncharged individual withdrew $1,000 using C.Y.'s card (which, as noted above, Karin Contreras personally used twice), Karin Contreras watched in the background.



On July 2, 2020, she was present while charged co-conspirator Manuel de la Cruz Contreras withdrew $3,000 using cards in the names of C.Y., R.L.O., and D.F.R. As noted above, Ms. Contreras personally used each of those cards on separate days to withdraw funds too.



On July 7, 2020, two minutes before she personally withdrew funds using cards in the names of J.W. and C.Y., Ms. Contreras can be seen in the background as another uncharged individual withdrew $1,000 using a card in the name of R.L.O. Ms. Contreras used the same R.L.O. card to withdraw funds on July 1 and July 14.



On July 8, 2020, Ms. Contreras and Manuel de la Cruz Contreras withdrew money together. She withdrew $4,000 while he withdrew $3,000.



On July 11, 2020, they were back at it again with her withdrawing $3,000 and him $2,000.



Karin Contreras had a close personal relationship with at least seven other individuals who were captured on Bank of America surveillance withdrawing funds as part of the scheme.

### C. Search Warrant of Gmail Account in Karin Contreras' Name

As part of the investigation, the United States obtained a search warrant for a Gmail account in Karin Contreras' name. As shown below, the results included a July 2, 2020, email from Ulises Contreras with a photograph of a Social Security card in the name of R.C. Notably, that name was used to fraudulently obtain benefits as part of the scheme, and Ms. Contreras personally withdrew $1,000 from the debit card issued in R.C.'s name on the same day that she used seven other cards. Moreover, the following day, Individual Two—with whom she was in a romantic relationship—withdrew $1,000 from the card. Bank of America closed the card for fraud before it could be used again.

**From:** Ulises Contreras <ulisescontreras[redacted]@gmail.com>
**To:** karincontreras[redacted]@gmail.com
**Subject:**
**Date:** Thu, 02 Jul 2020 05:24:53 +0000
**Inline-Images:** PHOTO-2020-07-01-12-20-52.jpg



The search warrant of the same email account also included a July 15, 2020, email from Ulises Contreras to Karin Contreras with a picture of a Social Security card in L.J.C.C.'s name.

**From:** Ulises Contreras <ulisescontreras[redacted]@gmail.com>
**To:** karincontrer[redacted]@gmail.com
**Subject:**
**Date:** Wed, 15 Jul 2020 18:24:51 +0000
**Inline-Images:** IMG-0645.JPG




L.J.C.C.'s name was used to fraudulently obtain UI benefits. Karin Contreras' estranged husband Esdra Castillo used the prepaid debit card in L.J.C.C.'s name to withdraw $1,000 on July 11, 2020, and then again on July 12, 2020, as shown below.






Ms. Contreras used the card to withdraw $1,000 on July 14, 2020, and Individual Two used it on July 15, 2020. Bank of America closed the card for fraud on July 15, 2020, which was the same day Ulises Contreras emailed a copy of the Social Security card to Karin Contreras.

**D. Search of Karin Contreras' Phone**

***i. Additional Identification Cards***

After Ms. Contreras was arrested in September 2025, a search of her cell phone included photographs of multiple identification cards, specifically social security cards in the names of K.A.M.B. and W.C. and Dominican Republic identification cards in the names of E.P.P.A. and J.M.R.M. The United States does not believe these identities or cards were related to the 2020

scheme to fraudulently obtain UI benefits, but their presence on her phone is relevant in considering whether her active participation in the conspiracy to obtain UI benefits was truly aberrant conduct, as the defense contends. *See* Defendant's Obligation and Response to PSR at p.2, Part E. The below images show the identification cards located on her phone.










### ii. ***Evidence of Participation in Conspiracy to Sell Stolen Airbags***

Ms. Contreras' phone also included information regarding selling stolen airbags, further countering the assertion that her UI fraud conduct was aberrant. Her brother Ulises Contreras was heavily involved in the theft and sale of stolen motor vehicle parts, specifically rims and airbags, which he brought to her residence. Ms. Contreras had customers that bought airbags from her. *See* ECF No. 52 at ¶ 28. The following text messages have been translated using Google Translate.

<u>May 17, 2023 Exchange</u>




| |
|---|
| I'm looking for a CRV<br><br>I might have the ones you just asked for ready by tomorrow. |

June 20, 2023 Exchange

| Message | Translation |
| --- | --- |
| ↘ Received<br>[redacted]08 6/20/2023 7:47:21.000 PM<br>Sabe usted cuando?? | Do you know when?? |
| ↘ Received<br>[redacted]08 6/20/2023 7:47:29.000 PM<br>O ya busco por otro lado | Or I'll look elsewhere |
| ↘ Received<br>[redacted]08 6/20/2023 7:47:30.000 PM<br>?? | ?? |
| ↖ Sent<br>Local User <00008110-00090DA636EB801E_files_full.zip><br>6/20/2023 7:49:53.000 PM<br>Yo le boy a tener 2 o 3 para mañana si dios quiere | I'll have 2 or 3 ready tomorrow, God willing. |
| ↖ Sent<br>Local User <00008110-00090DA636EB801E_files_full.zip><br>6/20/2023 7:50:03.000 PM<br>Hoy me las traen | They're bringing them to me today. |
| ↖ Sent<br>Local User <00008110-00090DA636EB801E_files_full.zip><br>6/20/2023 7:50:14.000 PM<br>Solo esas quieres ? | Do you only want those? |

July 26, 2023 Exchange

Additional texts established that the airbags were stored at her residence.

| Message | Translation |
| --- | --- |
| ↖ Sent<br>Local User <00008110-00090DA636EB801E_files_full.zip><br>7/26/2023 1:32:47.000 AM<br>Yo no estoy en el area peto tengo una civic en la casa si quiere puede pasar por ella cuáles son las q necesita? | I'm not in the area, but I have a Civic at home; you're welcome to stop by and pick it up. Which parts do you need? |
| ↘ Received<br>[redacted]08 7/26/2023 1:34:18.000 AM<br> | |
| ↘ Received<br>[redacted]08 7/26/2023 1:34:34.000 AM<br>Acura mdx tlx | Acura mdx tlx |

September 10, 2023 Exchange

↖ Sent
Local User <00008110-00090DA636EB801E_files_full.zip>
9/10/2023 2:37:47.000 PM
Bueno día don Carlos tengo estas dos por si le interesan

↖ Sent
Local User <00008110-00090DA636EB801E_files_full.zip>
9/10/2023 2:38:09.000 PM



Good day, Don Carlos. I have these two if you're interested.

May 18, 2025 Exchange

↘ Received
[redacted]08
5/18/2025 2:50:22.000 AM
Esta en su casa,?

↘ Received
[redacted]08
5/18/2025 2:50:29.000 AM
Puedo llegar

↖ Sent
Local User <00008110-00090DA636EB801E_files_full.zip>
5/18/2025 2:50:41.000 AM
Si aquí estoy ven

↘ Received
[redacted]08
5/18/2025 2:50:54.000 AM
Ok ahi llego

Are you at home?

I can make it

Yes, I'm here-come over

Okay, I'm on my way.

### E. Indictment, Arrest & Guilty Plea

On June 27, 2025, the grand jury returned a 28-count indictment charging Ulises Contreras, Karin Contreras, Esdra Castillo, and Manuel Domingo de la Cruz Contreras with various offenses related to their fraudulent scheme to obtain UI benefits. Karin Contreras was charged in eleven

counts with conspiracy to commit wire fraud, mail fraud, wire fraud, conspiracy to commit unauthorized access device fraud, unauthorized access device fraud, and aggravated identity theft.

On September 9, 2025, she was arrested. The following day, she had her initial appearance and was released into the High Intensity Supervision Program.

On July 10, 2026, she pled guilty to the lead count in the indictment, conspiracy to commit wire fraud. As part of the plea agreement, the government agreed to dismiss the remaining counts, including aggravated identity theft, at sentencing.

## II. Sentencing Guidelines

Consistent with the parties' plea agreement, the presentence investigation report writer found that the following provisions apply and that Ms. Contreras' total offense level is 22.

| | | |
|---|---|---|
| USSG § 2B1.1(a)(1) | Base Offense Level | 7 |
| USSG § 2B1.1(b)(1)(H) | Loss Amount: More than $550,000 | 14 |
| USSG § 2B1.1(b)(2)(A) | Offense Involved 10 or More Victims | 2 |
| USSG § 2B1.1(b)(11)(C) | Use of means of ID to obtain any other means of ID / Possession of 5 or more means of ID | 2 |
| USSG § 2B1.1(b)(12) | Offense involved conduct set forth in 18 USC 1040 | 2 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| USSG § 4C1.1 | Zero-Point Offender Adjustment | -2 |

PSR ¶ 15-24.

In response to the draft PSR, Ms. Contreras lodged two objections to the above calculations. She argued that 12 levels should be added for loss instead of 14 because of inflationary adjustments to the loss table that will go into effect on November 1, 2026. She also argued that she should receive a minor role. Defendant's Response to Draft PSR at 2. The Court should reject both arguments.

Ms. Contreras' argument regarding the 2026 Amendment to the loss table is misplaced. It is true that the § 2B1.1 loss table in the 2025 Guidelines Manual calls for a 14-level increase when loss is more than $550,000 but below $1,500,001. *See* USSG § 2B1.1(b)(1)(H)-(I). It is also true that absent Congressional action, on November 1, 2026, the 2026 Amendments to the Sentencing Guidelines will go into effect and change USSG § 2B1.1(b)(1)(H) to require a 14-level increase when loss is more than $750,000 but below $2,000,001. *See* Amendments to the Sentencing Guidelines at 13-14, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202605_Amendments.pdf. However, that Amendment does not change Ms. Contreras' Guidelines range.

Although Karin Contreras and her fellow conspirators realized approximately $551,000 from their criminal scheme, they attempted to realize more than $1 million as evidenced by the over $1 million in fraudulently-acquired benefits that were loaded onto prepaid debit cards. PSR ¶ 26. The Sentencing Guidelines make clear that the number used for calculating loss "is the greater of actual loss or intended loss." *See* USSG § 2B1.1(b)(1), Notes to Table. Here, the intended loss was more than $1 million from the scheme. Thus, even considering the inflationary adjustment to § 2B1.1's loss table, a 14-level increase is still proper because the intended loss was greater than $750,000.

Ms. Contreras' argument that she should receive a minor role adjustment compared to co-defendant Ulises Contreras should be rejected for two reasons. First, as part of her plea agreement, she agreed not to seek a Guidelines range different from that set forth in the plea agreement. ECF No. 72 at Section 4.D (page 4) (except for limited exceptions, "the parties also agree that

neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above").[1] Second, she is not entitled to such a reduction.

The government agrees that she was less culpable than her brother Ulises Contreras, but he already agreed to a four-level aggravating role adjustment as part of his plea agreement given his role as an organizer/leader of criminal activity involving five or more people. ECF No. 49 at 3; *see also* PSR ¶ 29. Thus, her plea agreement reflects her lesser role.

Moreover, although only four people were charged in the indictment, there were more participants involved in the scheme. The Guidelines define a "participant" as a "person who is criminally responsible for the commission of the offense, but need not have been convicted" or even charged. USSG § 3B1.1, comment. (n.1); *United States v. De La Torre*, 940 F.3d 938, 946 (7th Cir. 2019) ("The participant need not have been charged either, as long as 'the participant could have been charged.'" (quoting *United States v. Pabey*, 664 F.3d 1084, 1097 (7th Cir. 2011))). Here, in addition to the four charged defendants, the investigation revealed that at least eight other individuals withdrew money from ATMs. Notably, Karin Contreras was a common thread to many of these individuals. Ulises Contreras is her brother and lived at her residence. Esdra Castillo is her estranged husband. Manuel de la Cruz Contreras is her cousin. Individual Two was her romantic partner and lived with her.[2] Other individuals to whom she is related by blood and/or whom she has a close familial-type of relationship were captured withdrawing money at ATMs and/or being present at ATMs when money was withdrawn as part of the scheme. With the exception of Individual Two, the government's investigation revealed that Karin Contreras played

[1] Unlike the change to the loss table, which Ms. Contreras noted at her plea hearing, there has been no similar change to the role provision at USSG § 3B1.

[2] Individual Two is serving a long prison sentence in New York for a violent offense wholly unrelated to the UI benefits scheme. Post-indictment, the government learned that he played an active role in the UI benefits conspiracy, and if charged, would have warranted an aggravating role adjustment.

a more active role in the conspiracy than these other uncharged individuals. She gave her brother other people's PII for use in the scheme, she lived immediately next door to where most of the prepaid debit cards were mailed, she personally withdrew $23,000 from ATMs, and she accompanied others when they withdrew funds. Taken together, she was not "substantially less culpable than the average participant in the criminal activity" because she was neither among the least culpable of those involved in the conduct nor less culpable than most other participants. *See* USSG § 3B1.2, comment. (n.4-5).

Accordingly, the Court should conclude that Ms. Contreras' total offense level is 22.

Although Ms. Contreras was convicted of misdemeanor assault on a police officer in 2010, that conviction does not score for purposes of her criminal history. Thus, she has no criminal history points. PSR ¶ 50. Based on a total offense level of 22 and Criminal History Category I, the Guidelines recommend a sentence of 41 months to 51 months. PSR ¶ 91. [3]

### III. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid

[3] The recommended fine range based on the 2025 Guidelines is $15,000 to $150,000, which is consistent with the range set forth in the plea agreement. PSR ¶ 110. The 2026 Amendments are scheduled to increase the recommended fine at offense level 22 to $20,000 to $200,000. *See* Amendments to the Sentencing Guidelines at 19-20, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202605_Amendments.pdf. Under USSG § 1B1.11(b)(2), the Court must apply one Guidelines Manual in its entirety. The United States is not requesting the imposition of a fine in this case.

unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Karin Contreras actively participated in a scheme to siphon money from unemployment insurance programs designed to help unemployed people scrape by during the COVID-19 pandemic. Her involvement was not just limited to one or two criminal acts. On the contrary, she decided 23 separate times to take a pre-paid debit card issued in someone else's name, to insert that card into an ATM, and to withdraw $1,000 in cash. She also accompanied others to ATMs while they withdrew fraudulently-obtained funds and provided other people's PII to her brother who submitted fraudulent applications. Taking advantage of a program designed to help Americans in their and the nation's time of need is serious and warrants a significant prison sentence.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

In 2023, the Government Accountability Office estimated that fraud accounted for as much as 15 percent of unemployment benefits paid during the pandemic. *See Unemployment Insurance: Estimated Amount of Fraud During Pandemic Likely Between $100 Billion and $135 Billion,* U.S. Government Accountability Office (Sept. 12, 2023), https://www.gao.gov/assets/gao-23-106696.pdf at 2. The SBA Office of Inspector General determined that at least 17 percent of COVID-19 EIDL and PPP funds that were disbursed went to fraudsters. *See Covid-19 Pandemic EIDL and PPP Loan Fraud Landscape: White Paper Report 23-09*, U.S. Small Business Administration Office of Inspector General (June 27, 2023), https://legacy.sba.gov/sites/default/files/2023-06/SBA%20OIG%20Report%2023-09.pdf at 2.

The amount of fraud involved in pandemic-related programs—whose purpose was to keep the economy from collapsing due to a devastating disease—is staggering. The rampant fraud involved in these programs warrants serious consequences for those convicted of such behavior, especially given that many will never be brought to justice. Significant prison sentences are necessary to promote respect for the law and send a message to would-be fraudsters that if you are caught engaging in such behavior, the consequences will be severe. A 41-month sentence would send that message.

**C. The History and Circumstances of the Defendant**

Ms. Contreras' childhood was far from ideal, but after growing up in the Dominican Republic, she was welcomed by America, which ultimately granted her lawful permanent resident status. Rather than dedicating her life to taking advantage of the legal opportunities America offered, she chose to participate in a criminal scheme to raid a program designed to help people during their utmost hour of need. Moreover, based on the information recovered from her phone following her arrest—the photos of identification cards, the exchanges about selling airbags stolen by her brother—her participation in the unemployment insurance benefits scheme was not aberrant behavior warranting leniency from this Court.

**D. Unwarranted Sentencing Disparities**

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United*

*States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "During the last five fiscal years (FY2021-2025), there were 501 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 22 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 119. Ninety-six percent of those defendants received some sort of prison sentence with the mean being 33 months and the median 34 months. *Id*.

Although the individual circumstances of the 501 defendants referenced above are unknown, there clearly were defendants who received sentences greater than 34 months. Based on the facts in this case, which include Ms. Contreras admitting to engaging in conduct that would support an aggravated identity theft conviction, the government submits that she deserves a sentence at the bottom of the guidelines, i.e., 41 months, and that such a sentence would not lead to an unwarranted sentencing disparity.

**E. Restitution**

The United States requests that the Court order Ms. Contreras to be jointly and severally liable with any convicted co-defendants for restitution in the amount of $551,674.78. The

government also requests that the Court refer to the $23,000 forfeiture money judgment (ECF No. 75) at sentencing and include it in the judgment.

## CONCLUSION

The Court should sentence Karin Contreras to 41 months in prison followed by two years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: *_/s/ Kondi J. Kleinman_*
Kondi J. Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
202.252.6887 | kondi.kleinman2@usdoj.gov

John Kosmidis, NY Bar. No. 4533840
Trial Attorney
Criminal Division, Fraud Section
1400 New York Avenue, N.W. | Washington, D.C. 20005
john.kosmidis@usdoj.gov | (202) 641-3109